Kenneth B. Black (5588)
Email: *ken.black@stoel.com*
Timothy K. Conde (10118)
Email: *timothy.conde@stoel.com*
STOEL RIVES LLP
201 South Main Street, Suite 1100
Salt Lake City, Utah 84111
Telephone:  (801) 328-3131
Facsimile:  (801) 578-6999

Jerome A. Swindell (*pro hac vice* application
forthcoming)
Email: *jswindel@its.jnj.com*
Assistant General Counsel
JOHNSON & JOHNSON
One Johnson & Johnson Plaza
New Brunswick, NJ 08933
Telephone: (732) 524-3965
Facsimile:  (732) 524-5823

Jonathan F. Cohn (*pro hac vice* application
forthcoming)
Email: *jfcohn@sidley.com*
Ken Glazer (*pro hac vice* application
forthcoming)
Email: *kglazer@sidley.com*
Kwaku A. Akowuah (*pro hac vice*
application forthcoming)
Email: *kakowuah@sidley.com*
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 736-8110
Facsimile:  (202) 736-8711

Joel M. Mitnick (*pro hac vice* application
forthcoming)
Email: *jmitnick@sidley.com*
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 839-5871
Facsimile:  (212) 839-5599

Attorneys for
Johnson & Johnson Vision Care, Inc.

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JOHNSON & JOHNSON VISION CARE, INC., a Florida corporation,<br><br>    Plaintiff,<br><br>        v.<br><br>SEAN D. REYES, in his Official Capacity as Attorney General of Utah,<br><br>    Defendant. | **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT**<br><br>Case No. 2:15-cv-00257-CW<br><br>Judge Clark Waddoups |

## <u>TABLE OF CONTENTS</u>

**Page**

MOTION FOR PRELIMINARY INJUNCTION..............................................................1

BACKGROUND ............................................................................................................2

    A.  The Interstate Contact Lens Market.......................................................................2

    B.  JJVCI's Unilateral Pricing Policy (UPP)...............................................................3

STANDARD FOR GRANTING INJUNCTIVE RELIEF ................................................6

ARGUMENT ...................................................................................................................6

    A.  JJVCI Is Likely To Succeed On The Merits Of Its Claims. .................................6

        1.  Section 905.1 Invalidly Seeks To Regulate Out-Of-State Retail Prices........................9

        2.  Section 905.1 Invalidly Attempts To Regulate Wholesale Transactions That Occur Wholly Outside Of Utah. ..........................................................11

        3.  Section 905.1 Impermissibly Attempts To Mandate Cross-Border Sales Of Commercial Goods And Unlawfully Discriminates Against Non-Resident Retailers. ....................................................................13

    B.  JJVCI Will Suffer Irreparable Harm Absent A Preliminary Injunction. ...........14

    C.  The Balance Of Equities Weighs In Favor Of Preliminary Injunctive Relief.............................................................................................................15

CONCLUSION...............................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Civil Liberties Union v. Johnson*,
194 F.3d 1149 (10th Cir. 1999) ........................................................................14

*Awad v. Ziriax*,
670 F.3d 1111 (10th Cir. 2012) ........................................................................16

*Baldwin v. G.A.F. Seelig, Inc.*,
294 U.S. 511 (1935) .......................................................................................7, 9

*Bibb v. Navajo Freight Lines, Inc.*,
359 U.S. 520 (1959) ..........................................................................................10

*Bos. Stock Exch. v. State Tax Comm'n*,
429 U.S. 318 (1977) ..........................................................................................14

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*,
476 U.S. 573 (1986) ...........................................................................7, 9, 12, 13

*C&A Carbone, Inc. v. Town of Clarkson*,
511 U.S. 383 (1994) ..........................................................................................13

*Chamber of Commerce of U.S. v. Edmondson*,
594 F.3d 742 (10th Cir. 2010) ....................................................................15, 16

*Dean Foods Co. v. Brancel*,
22 F. Supp. 2d 931 (W.D. Wis. 1998) ..............................................................10

*Dennis v. Higgins*,
498 U.S. 439 (1991) .............................................................................................7

*Edgar v. MITE Corp.*,
457 U.S. 624 (1982) ...........................................................................7, 8, 10, 13

*Healy v. Beer Inst.*,
491 U.S. 324 (1989) ...........................................................................7, 9, 10, 12

*Hughes v. Oklahoma*,
441 U.S. 322 (1979) .....................................................................................7, 13

*Johns v. Stewart,*
    57 F.3d 1544 (10th Cir. 1995) ...............................................................15

*Kan. Health Care Ass'n v. Kan. Dep't of Soc. & Rehab. Servs.,*
    31 F.3d 1536 (10th Cir. 1994) ..........................................................6, 15

*Kassel v. Consol. Freightways Corp. of Del.,*
    450 U.S. 662 (1981) (plurality opinion) ...............................................10

*Lemke v. Farmers' Grain Co.,*
    258 U.S. 50 (1922).................................................................................10

*Nevares v. M.L.S.,*
    No. 20120763, 2015 WL 502856 (Utah Feb. 6, 2015)....................11, 12

*Nken v. Holder,*
    556 U.S. 418 (2009)..........................................................................6, 16

*Or. Waste Sys., Inc. v. Dep't of Envtl. Quality,*
    511 U.S. 93 (1994) .................................................................................13

*Pharm. Research & Mfrs. of Am. v. Dist. of Columbia,*
    406 F. Supp. 2d 56 (D.D.C. 2005), *aff'd sub nom. Biotech. Indus. Org. v. Dist. of Columbia*, 496 F.3d 1362 (Fed. Cir. 2007)........................................12

*Philadelphia v. New Jersey,*
    437 U.S. 617 (1978)...............................................................................13

*Quik Payday, Inc. v. Stork,*
    549 F.3d 1302 (10th Cir. 2008) ...................................................8, 10, 14

*S. Pac. Co. v. Arizona ex rel. Sullivan,*
    325 U.S. 761 (1945) .................................................................................9

*Singleton v. Wulff,*
    428 U.S. 106 (1976)...............................................................................11

*State v. Wood,*
    648 P.2d 71 (Utah 1982).........................................................................11

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.,*
    550 US. 330 (2007)...........................................................................8, 14

*Univ. of Tex. v. Camenisch,*
    451 U.S. 390 (1981)..................................................................................6

*Utah Dep't of Transp. v. Carlson*,
  332 P.3d 900 (Utah 2014) ...............................................................................................11, 12

**Constitution**

U.S. Const. art. VI., cl. 2 ...............................................................................................16

**Other Authorities**

House Floor Video Day 43 Part 1 at 2:09:47–2:10:16, Utah State Legislature
  (Mar. 10, 2015), http://utahlegislature.granicus.com/MediaPlayer.php?clip_id
  =18885&meta_id=551207 ...........................................................................................5

Meeting of the Senate Business and Labor Standing Committee at 49:48–50:45,
  Utah State Legislature (Feb. 17, 2015), http://utahlegislature.granicus.com/
  MediaPlayer.php?view_id=2&clip_id=18415&meta_id=237794 ...........................................5

## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Johnson & Johnson Vision Care, Inc. ("JJVCI"), respectfully moves for a preliminary injunction, enjoining enforcement of Utah Code Section 58-16a-905.1 ("Section 905.1").

Section 905.1 is an unconstitutional overreach of State legislative powers.  It seeks to regulate the nationwide contact lens market and thus violates the Commerce Clause in three distinct ways.

*First*, Section 905.1 attempts to regulate the price at which contact lenses are sold to consumers in all 50 States.  The statute purports to prohibit "any action" by a manufacturer that "has the effect of fixing or otherwise controlling the price that a contact lens retailer charges or advertises for contact lenses," regardless of where those lenses are sold.  Only 1% of JJVCI's ACUVUE® lenses are sold to Utah consumers.

*Second*, the statute unlawfully regulates commercial transactions between *out-of-State* manufacturers, like JJVCI, and *out-of-State* retailers and distributors.  Section 905.1 requires out-of-State manufacturers to sell contact lenses to out-of-State retailers and distributors even when those retailers and distributors violate the manufacturers' pricing policies.

*Third*, Section 905.1 also mandates interstate commerce between out-of-State manufacturers and in-*State* retailers and distributors.  In so doing, the statute directly regulates interstate transactions and discriminates in favor of in-State interests.

This motion is based upon the accompanying memorandum and affidavit, as well as such evidence or argument as may be submitted in conjunction with the hearing of this motion.  Because the statute violates the Commerce Clause, because an injunction is necessary to prevent

irreparable harm, and because enjoining unconstitutional State action necessarily serves the public interest, this Court should grant the Motion. Absent an injunction, Section 905.1 will take effect on May 12, 2015.

## **BACKGROUND**

A.      **The Interstate Contact Lens Market.**

1.      Contact lenses are medical devices regulated by the Food and Drug Administration and available for sale only pursuant to a prescription written by a licensed eye care professional, such as an optometrist or ophthalmologist. *See* Complaint ¶¶ 12-13. Contact lenses are used to treat a variety of vision impairments that affect millions of Americans, including near- and far-sightedness and astigmatism. *Id.* ¶ 11.

2.      Plaintiff JJVCI is the leading manufacturer of contact lenses in the United States. *See* Affidavit of Laura Angelini (4/14/15) ("Angelini Aff.") ¶ 3. JJVCI manufactures ACUVUE® contact lenses for the U.S. market in Florida, where JJVCI is incorporated and headquartered, *id.* ¶ 4, and in the Republic of Ireland. *Id.* ¶ 3. JJVCI does not manufacture any contact lenses in Utah. *Id.* ¶ 4.

3.      Over 99% of JJVCI's ACUVUE® lenses are ultimately purchased by consumers in States other than Utah. *Id.* ¶ 13. Less than 1% are purchased by Utah consumers. *Id.* ¶ 13.

4.      ACUVUE® lenses may travel a number of different paths, through one or more of 35,000 distributors and retailers nationwide, before reaching an individual consumer. *Id.* ¶¶ 5-13. Almost none of those paths has any connection to Utah.

2

5.      Roughly thirty-two percent of ACUVUE® lenses are sold by JJVCI directly to national retail chains such as Wal-Mart or Walgreens, *none* of which is based in Utah.  *Id.* ¶¶ 6, 10.

6.      Approximately 13% of ACUVUE® lenses are sold to Internet-based retailers, which ship contact lenses to consumers in all 50 States.  *Id.* ¶ 8.  Only *one* such retailer, 1-800-CONTACTS, is based in Utah.  It receives shipments of ACUVUE® lenses in Utah, *id.* ¶ 10, but makes *99%* of its ACUVUE® sales to customers in other States.  *Id.* ¶ 11.

7.      The majority of ACUVUE® lenses, roughly 55%, are sold through independent eye care professionals who are not associated with any retail store chain or Internet-based retailer.  *Id.* ¶ 7.  JJVCI sells a small share of lenses directly to independent eye care professionals (including 76 in Utah, which account for about 1% of wholesale purchases in Utah, *id.* ¶ 10), but most lenses are sold indirectly through distributors.  *Id.* ¶ 7.  *None* of these distributors is based in Utah.  *Id.* ¶ 10.

**B.      JJVCI's Unilateral Pricing Policy (UPP).**

8.      Until the summer of 2014, consumers who purchased ACUVUE® lenses often encountered a cumbersome two-step pricing system.  First, consumers would pay an initial price at the register.  Complaint ¶ 24.  Second, in certain instances, those consumers could redeem manufacturer's rebates to obtain a discount from the initial price.  *Id.*  This system, however, routinely failed to deliver fully discounted prices to JJVCI's customers.  Only about twenty percent of ACUVUE® wearers would buy enough contact lenses annually to qualify for the manufacturer's rebates.  *Id.* ¶ 32.  Among those eligible for the rebates, only about thirty percent would complete and mail the rebate forms.  *Id.*  Thus, only six to eight percent of ACUVUE®

wearers actually redeemed manufacturer's rebates, and even those customers had to wait roughly

six to eight weeks to receive any rebate payment.  *Id.*

9.      In addition, both customers and eye care professionals found it difficult and time-

consuming to monitor rebate opportunities and all of the disparate prices offered by various

retailers.  *Id.* ¶ 27.  Customers and eye care professionals also found that conversations about

pricing distracted from examinations that should have been focused on issues of eye health and

vision challenges.  *Id.*

10.     Recognizing the flaws with this retail system, JJVCI introduced its nationwide

Unilateral Pricing Policy ("UPP") in the summer of 2014.  Angelini Aff. ¶ 14.  Under the UPP,

there are no manufacturer rebates,  *id.* ¶ 20, and each retailer must charge at least a minimum

price.  If it does not, JJVCI will stop selling lenses to the retailer.  *Id.* ¶ 20.

11.     The UPP-based pricing model thus eliminates the need for discussions with eye

doctors about other retailers' prices.  Consumers are assured that if their eye care professional, or

any other retailer, is charging the minimum price, there is no need to shop around for a better

bargain.  Complaint ¶ 28.

12.     These minimum prices are *lower* than the pre-UPP national average sales price.

*Id.* ¶ 29.  Although some customers pay more than they previously did, the UPP has produced

lower net costs for a significant majority of its customers.  *Id.*  The UPP also has reduced

retailers' costs because JJVCI simultaneously reduced the wholesale price.  *Id.* ¶ 29.

Nonetheless, the introduction of the UPP resulted in a lobbying blitz by some retailers, most

notably 1-800-CONTACTS, that preferred the old system.  The result of these efforts is Section

905.1.

4

13.     Enacted on March 27, 2015, Section 905.1 prohibits the UPP and similar pricing policies adopted by other contact lens manufacturers.  *See* Declaration of Timothy K. Conde (4/14/15) ("Conde Decl.") ¶ 2, Ex. A.  The statute provides that a "contact lens manufacturer or a contact lens distributor may not . . . take any action, by agreement, unilaterally, or otherwise, that has the effect of fixing or otherwise controlling the price that a contact lens retailer charges or advertises for contact lenses." *Id*., ¶ 2 Ex. A.  The statute also provides that a contact lens manufacturer or distributor may not "discriminate against"—i.e., refuse to do business with—"a contact lens retailer" who "sells or advertises contact lenses for a particular price." *Id*., ¶ 2 Ex. A.  To enforce these provisions, the Attorney General of Utah is authorized to "bring a civil action or seek an injunction and civil penalty against anyone who violates" Section 905.1.  *Id*., ¶2 Ex. A.

14.     The legislative intent is clear:  Both supporters and opponents of Section 905.1 expressly understood the bill as "targeted" to help retailers, including "1-800-CONTACTS, a Utah-based business," in an ongoing "turf battle" with out-of-State contact lens manufacturers. *See* Meeting of the Senate Business and Labor Standing Committee at 49:48–50:45, Utah State Legislature (Feb. 17, 2015)[1]; *see also* House Floor Video Day 43 Part 1 at 2:09:47–2:10:16, Utah State Legislature (Mar. 10, 2015) (legislator describing 1-800-CONTACTS as "a company I think we all revere . . . and are pleased to have in our state" but opposing the enacted version of

---

[1] http://utahlegislature.granicus.com/MediaPlayer.php?view_id=2&clip_id=18415&meta_id=237794.

the legislation, which he viewed as designed to undermine "things going on in the . . . market that are obviously disruptive to their business model.").[2]

## STANDARD FOR GRANTING INJUNCTIVE RELIEF

A preliminary injunction is an equitable remedy designed to "preserve the relative position of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "The district court may grant a preliminary injunction if the party seeking it shows: (1) a substantial likelihood of prevailing on the merits; (2) irreparable harm in the absence of the injunction; (3) proof that the threatened harm outweighs any damage the injunction may cause to the party opposing it; and (4) that the injunction, if issued, will not be adverse to the public interest." *Kan. Health Care Ass'n v. Kan. Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1542 (10th Cir. 1994). Where, as here, a governmental entity "is the opposing party," the final two factors are understood to "merge." *See Nken v. Holder*, 556 U.S. 418, 435 (2009). All of these factors support a preliminary injunction.

## ARGUMENT

### A.     JJVCI Is Likely To Succeed On The Merits Of Its Claims.

On its face and as applied to out-of-State manufacturers, Section 905.1 squarely conflicts with Supreme Court precedent. As the Supreme Court has explained, the "dormant" or "negative" aspect of the Commerce Clause establishes a "virtually *per se*" prohibition on any State regulation that, in practical effect, "directly regulates" interstate commerce or discriminates in "favor in-state economic interests over out-of-state interests." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986); *see also Edgar v. MITE Corp.*, 457 U.S.

---

[2] http://utahlegislature.granicus.com/MediaPlayer.php?clip_id=18885&meta_id=551207.

624, 640 (1982) ("The Commerce Clause . . . permits only *incidental* regulation of interstate commerce by the States; direct regulation is prohibited."); *Dennis v. Higgins*, 498 U.S. 439, 447 (1991) (Commerce Clause limitation on States is "self-executing "). These principles "reflect the Constitution's special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres." *Healy v. Beer Inst.*, 491 U.S. 324, 335-36 (1989) (footnotes omitted).

More specifically, the Supreme Court has held, first, that a State "has no power to project its legislation into [another State] by regulating the price to be paid in that state for [goods] acquired there." *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 521 (1935); *see also Brown-Forman*, 476 U.S. at 581 (holding State law unconstitutional because "the 'practical effect' of the law is to control liquor prices in other States"); *Healy*, 491 U.S. at 336 ("[A] State may not adopt legislation that has the practical effect of establishing 'a scale of prices for use in other states' . . . .") (citation omitted).

Second, "a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid." *Healy*, 491 U.S. at 336; *see also id.* at 337 ("[N]o State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another.").

Third, a state may not adopt any measure that dictates whether commercial goods cross its borders, whether moving into or out of the State, *see, e.g.*, *Hughes v. Oklahoma*, 441 U.S. 322 (1979); nor may a State discriminate against interstate commerce by producing "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the

latter," *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 US. 330, 338 (2007).

In addition to these "virtually *per* se" prohibitions, a State law is unconstitutional if it "puts a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits.'" *Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1309 (10th Cir. 2008) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). Thus, even State statutes that regulate interstate commerce indirectly are unconstitutional when "the burden imposed on that commerce" is "excessive in relation to the local interests served by the statute." *Edgar*, 457 U.S. at 643.

Section 905.1 violates every one of these constitutional rules. *First*, Section 905.1 seeks to regulate retail consumer prices, not just in Utah, but in all 50 States, by invalidating nationwide pricing policies. *Second*, the statute prohibits out-of-State manufacturers from "discriminat[ing]"—i.e, terminating—out-of-State retailers who refuse to abide by these nationwide pricing policies, and thus regulates transactions wholly outside the State of Utah. *Third*, Section 905.1 prohibits out-of-State manufacturers from terminating in-State retailers, and thus effectively *requires* interstate commerce on terms that discriminate in favor of in-State interests. In addition, the statute imposes unwarranted burdens on interstate commerce that are excessive in relation to the local interests, especially considering that the manufacturers are located outside of Utah, almost all of the retailers and distributors are outside of Utah, and 99% of the consumers are outside of Utah.

1.    *Section 905.1 Invalidly Seeks To Regulate Out-Of-State Retail Prices.*

Under Supreme Court precedent, a State cannot "project its legislation into [another State] by regulating the price to be paid in that state." *Seelig*, 294 U.S. at 521. The "potential

regional and even national regulation of the pricing mechanism for goods is reserved by the Commerce Clause to the Federal Government." *Healy*, 491 U.S. at 340. A State's regulation of prices in another State is *per se* unconstitutional. *See Brown-Forman*, 476 U.S. at 579-581.

For this reason, Section 905.1 is patently unconstitutional. It regulates prices in other States by prohibiting manufacturers from "fixing or otherwise controlling the price that a contact lens retailer charges" in those States. The power to set prices in the 50 States is transferred from manufacturer to retailers. Because Utah cannot "project its legislation" into other States, Section 905.1 violates the Commerce Clause.

For the most part, the statute regulates prices on contact lenses that have no connection at all to Utah. Almost all of the lenses are sold from an out-of-State manufacturer to an out-of-State retailer to an out-of-State consumer. *See* Angelini Aff. ¶¶ 6-13. But, even with respect to lenses that might pass through a Utah retailer, such as 1-800-CONTACTS, before reaching an out-of-State consumer, the constitutional analysis remains the same. Under *Brown-Forman* and *Healy*, the "practical effect" of the legislation is decisive. A State law is unconstitutional when "the 'practical effect' of the law is to control . . . prices in other States." *Brown-Forman*, 476 U.S. at 583; *see also Healy*, 491 U.S. at 336 ("[A] State may not adopt legislation that has the practical effect of establishing 'a scale of prices for use in other states.' . . . .") (citation omitted); *S. Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 775 (1945) (invalidating an Arizona law that limited the number of cars that a single railroad engine could carry when passing through Arizona, because of the "practical effect" of regulating railroad operations beyond Arizona); *Dean Foods Co. v. Brancel*, 22 F. Supp. 2d 931, 937 (W.D. Wis. 1998) ("a state cannot control the prices its residents charge out-of-state buyers"). A State with only a "slight" or

9

"problematical" interest cannot regulate commerce passing through the State on its way in between two other states.  *See, e.g.*, *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 529-30 (1959); *accord Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 674-79 (1981) (plurality opinion); *see also Lemke v. Farmers' Grain Co.*, 258 U.S. 50, 55-59 (1922) (invalidating North Dakota statute regulating grain transactions where "practically all the wheat" grown in North Dakota and at issue in the case "was for shipment to and sale" in out-of-State markets).

For these reasons, Section 905.1 is *per se* unconstitutional.  But, even if it were not, the statute still fails because it imposes "a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits.'"  *Quik Payday*, 549 F.3d at 1309 (quoting *Pike*, 397 U.S. at 142).  Utah cannot claim to have any valid interest in regulating the terms and conditions on which consumers in other States purchase contact lenses, *see Edgar*, 457 U.S. at 644 ("While protecting local investors is plainly a legitimate state objective, [Illinois] has no legitimate interest in protecting nonresident shareholders."), and 99% of ACUVUE® lenses are purchased by consumers in other States.  There is "nothing to be weighed in the balance to sustain the law" in its applications outside Utah.  *Id.*  In contrast, the substantial interests of other States in maintaining regulatory "autonomy . . . within their respective spheres" weighs heavily on the other side of the balance.  *Healy*, 491 U.S. at 336.

Section 905.1 violates the Commerce Clause, but at the very least, the Court should construe the statute narrowly on statutory grounds.  Utah recognizes the "fundamental rule that [courts] should avoid addressing a constitutional issue unless required to do so," *State v. Wood*, 648 P.2d 71, 82 (Utah 1982), and accordingly will adopt any "plausible" construction of a statute

that will serve that end.  *See Utah Dep't of Transp. v. Carlson*, 332 P.3d 900, 905 (Utah 2014).

A construction that confines Section 905.1 to consumer purchases in Utah is clearly a "plausible"

result because Utah courts apply a presumption against extraterritoriality, and thus will hold that

the Utah legislature does not intend its statutes to have effect outside of Utah's borders, absent a

"clear statement" to the contrary.  *See, e.g.*, *Nevares v. M.L.S.*, No. 20120763, 2015 WL 502856,

at *7 (Utah Feb. 6, 2015); *see also, e.g.*, *Singleton v. Wulff*, 428 U.S. 106, 114 (1976) (avoiding

"unnecessary constitutional adjudications").   A narrowing construction would not solve all of

the constitutional infirmities of Section 905.1, *see infra* at pp. 11-14, but in principle would at

least limit the statute to sales to consumers in Utah.

>        2.        *Section 905.1 Invalidly Attempts To Regulate Wholesale Transactions*
>                  *That Occur Wholly Outside Of Utah.*

Even with respect to Utah consumers, Section 905.1 violates the Commerce Clause.  As

discussed, almost 90% of JJVCI's sales are to out-of-State retailers or distributors.  Under

Section 905.1, however, JJVCI cannot enforce its UPP with respect to these out-of-State

companies.  Any action taken against them to enforce the UPP would violate the statute,

potentially giving rise to civil penalties.

The Supreme Court has unequivocally held that "a [State] statute that directly controls

commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the

enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach

was intended by the legislature," and "'whether or not the commerce has effects within the

State.'"  *Healy*, 491 U.S. at 336 (quoting *Edgar*, 457 U.S. at 642-43).  Under *Healy*, Utah has no

power to regulate transactions between out-of-State manufacturers and out-of-State retailers or

distributors.  It does not matter that the out-of-State retailer may, in turn, sell to Utah consumers;

Utah cannot regulate the relationship between two companies that transact business outside the State of Utah. *See Brown-Forman*, 473 U.S. at 580 ("The mere fact that the effects of New York's [statute] are triggered only by sales of liquor within the State of New York . . . does not validate the law if it regulates the out-of-state transactions of distillers who sell in-state.").

A district court invalidated a similar District of Columbia ordinance on just these grounds. *See Pharm. Research & Mfrs. of Am. v. Dist. of Columbia*, 406 F. Supp. 2d 56 (D.D.C. 2005), *aff'd sub nom. Biotech. Indus. Org. v. Dist. of Columbia*, 496 F.3d 1362 (Fed. Cir. 2007). The D.C. ordinance provided that it would be "unlawful for any drug manufacturer or licensee thereof . . . to sell or supply for sale or impose minimum resale requirements for a patented prescription drug that results in the prescription drug being sold in the District for an excessive price." *Id.* at 60. The district court found the ordinance invalid, reasoning that it "effectively seeks to regulate transactions that occur wholly out of state." *Id.* at 67. This was true even though "liability [was] not triggered under the Act until a retail sale was made 'in the District.'" *Id.* at 68. The practical reality was that the law regulated non-D.C. transactions.

Because Utah cannot constitutionally regulate out-of-State transactions, the Court should enjoin Section 905.1. At the very least, the Court should rule that the statute does not apply when the out-of-State manufacturer sells to an out-of-State retailer or distributor. *See Carlson*, 332 P.3d at 905; *Nevares*, 2015 WL 502856, at *7.

3.      *Section 905.1 Impermissibly Attempts To Mandate Cross-Border Sales Of Commercial Goods And Unlawfully Discriminates Against Non-Resident Retailers.*

In the end, however, no narrowing interpretation can salvage Section 905.1. Even if the Court construed Section 905.1 not to apply to consumer purchases in other States, and also not to

apply to transactions between out-of-State manufacturers and out-of-State retailers or
distributors, the statute still violates the Commerce Clause.

No matter how narrowly the statute is construed, it still purports to "directly regulat[e]"
interstate commerce, which is *per se* unlawful. *See, e.g.*, *Brown-Forman*, 476 U.S. at 579;
*Edgar*, 457 U.S. at 640. On its face, the law provides that contact lens manufacturers, like
JJVCI, may not "discriminate against"—i.e., refuse to do business with—"a contact lens retailer"
who "sells or advertises contact lenses for a particular price." *See* Conde Decl." ¶ 2, Ex. A. The
statue thus *requires* out-of-State manufacturers to continue to do business with in-State retailers,
even when the retailers violate the manufacturers' pricing policies and would otherwise be
terminated.

But no State can mandate interstate commerce. It is firmly established that a State may
not adopt direct measures to control the flow of commercial goods across its border, whether
moving into or out of the State. For example, *Hughes v. Oklahoma*, 441 U. S. 322, held that a
State may not prohibit the export of commercial articles from within its borders. Similarly,
*Philadelphia v. New Jersey*, 437 U.S. 617 (1978) and *Oregon Waste Systems, Inc. v. Department
of Environmental Quality*, 511 U.S. 93 (1994), make clear that a State may not stop commercial
goods from being *imported* into the State. *See also C&A Carbone, Inc. v. Town of Clarkson*, 511
U.S. 383, 392 (1994) (invalidating an ordinance that "bar[ed] the import of the processing
service"); *Bos. Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 336-37 (1977) (striking down a
New York taxing measure that in purpose and effect caused a "diversion of interstate commerce"
away from out-of-state stock exchanges and to New York exchanges).

13

Like the State laws in these cases, Section 905.1 "directly regulat[es]" interstate commerce, which is precisely the power that the Commerce Clause reserves exclusively to the U.S. Congress. The statue also imposes "a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits.'" *Quik Payday*, 549 F.3d at 1309 (quoting *Pike*, 397 U.S. at 142).

The burden imposed by Section 905.1 is particularly intolerable for two reasons. First, once the law is cabined to Utah retailers, it discriminates in favor of such Utah companies over out-of-State manufacturers by regulating the terms on which they do business. Second, the statute discriminates in favor of Utah retailers over out-of-State retailers. In-State retailers would be able to set any price they want without risk of termination by the manufacturer; out-of-State retailers could not. In-State retailers could thus charge lower prices for the same contact lenses. Because the Commerce Clause *per se* prohibits "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter," *see United Haulers Ass'n*, 550 U.S. at 338 (quoting *Or. Waste Sys.*, 511 U.S. at 99), Section 905.1 is unconstitutional.

**B.      JJVCI Will Suffer Irreparable Harm Absent A Preliminary Injunction.**

The statute would also inflict irreparable harm on JJVCI if permitted to take effect. "Deprivation of the rights guaranteed under the Commerce Clause constitutes irreparable injury." *Am. Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999) (quoting *Am. Libraries Ass'n v. Pataki,* 969 F. Supp. 2d 160, 168 (S.D.N.Y. 1997)). Moreover, Section 905.1 purports to require JJVCI to restructure its nationwide pricing policies, and thus its relationships with distributors, retailers, and customers all across the country. Angelini Aff. ¶ 23. If JJVCI does not comply with this invalid nationwide command, it faces the prospect of enforcement

actions initiated by the Utah Attorney General and, potentially, resulting civil penalties.  The

avowed purpose of Section 905.1 was to disrupt JJVCI's UPP-pricing model and shift business

value to retailers, including 1-800-CONTACTS.  *See supra* at pp. 5-6.  Given that design, it

should be no surprise that if the law takes effect, JJVCI will suffer tangible losses.  *See* Angelini

Aff. ¶ 24.

    The Court should not accept any argument that these harms are not irreparable because of

their monetary nature.  It is true that in other circumstances monetary harms are deemed not

irreparable because a prevailing plaintiff can recover through civil damages.  But here, JJVCI's

suit is against the State, and the Eleventh Amendment, in combination with Utah sovereign

immunity principles, would bar JJVCI from seeking damages against Utah.  *See Kan. Health

Care Ass'n*, 31 F.3d at 1543.  Indeed, the Tenth Circuit has squarely held that the "[i]mposition

of monetary damages that cannot later be recovered for reasons such as sovereign immunity

constitutes irreparable injury."  *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742,

770-71 (10th Cir. 2010); *see also Johns v. Stewart*, 57 F.3d 1544, 1553-54 (10th Cir. 1995)

(same).  Any argument to the contrary would fail as a matter of law.

    **C.**    **The Balance Of Equities Weighs In Favor Of Preliminary Injunctive Relief.**

    The final two prongs of the preliminary injunction standard consider "the public interest"

and whether "the threatened harm outweighs any damage the injunction may cause to the party

opposing it."  *Kan. Health Care Ass'n*, 31 F.3d at 1542.  These prongs "merge" into one when

the government is the party opposing the relief, *see Nken*, 556 U.S. at 435, and they weigh

heavily in favor of issuing a preliminary injunction in this case.

The Tenth Circuit has emphasized that because the United States Constitution is the "supreme law of the land," U.S. Const. art. VI., cl. 2, it is "*always* in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) (emphasis added) (internal quotation marks omitted).  "[T]he public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law." *Edmondson*, 594 F.3d at 771 (quoting *Bank One v. Guttau*, 190 F.3d 844, 848 (8th Cir. 1999)). That is particularly true here, where JJVCI seeks to preserve the status quo by requesting injunctive relief as to a law that has not yet gone into effect.  There is no sound reason to allow Section 905.1 to take effect, only to strike it down *after* it has caused unlawful disruptions in the nationwide contact lens industry.

It bears emphasis, further, that the status quo is currently yielding lower prices for a significant majority of JJVCI's customers and has enabled eye care professionals to devote their energies and clinical time to their patients' vision needs rather than monitoring retail prices and rebates.  *See* Angelini Aff. ¶ 19.  That status quo should be preserved.

## CONCLUSION

For the foregoing reasons, JJVCI respectfully requests that the Court (1) enter a preliminary injunction barring enforcement of Section 905.1 and (2) set an appropriate schedule for resolving JJVCI's claims for declaratory and permanent injunctive relief.

Dated:   April 14, 2015                      Respectfully submitted,

                                             STOEL RIVES LLP
                                             SIDLEY AUSTIN LLP


                                             By: /s/ *Kenneth B. Black*
                                                    Kenneth B. Black

                                             Attorneys for Johnson & Johnson
                                             Vision Care, Inc.

17