IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ALCON LABORATORIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>SEAN D. REYES, Attorney General of Utah,<br><br>Defendant. | **ORDER**<br><br>Case No. 2:15cv252-DB<br><br>District Judge Dee Benson |
| JOHNSON & JOHNSON VISION CARE,<br><br>Plaintiff,<br><br>v.<br><br>SEAN D. REYES, Attorney General of Utah,<br><br>Defendant. | Case No. 2:15cv257-CW<br><br>District Judge Clark Waddoups |
| BAUSH & LOMB,<br><br>Plaintiff,<br><br>v.<br><br>SEAN D. REYES, Attorney General of Utah,<br><br>Defendant. | Case No. 2:15cv259-DAK<br><br>District Judge Dale A. Kimball |

This case is before the court on Plaintiffs Alcon Laboratories, Inc.'s ("Alcon") (Dkt. No. 5), Johnson & Johnson Vision Care, Inc.'s ("JJVC") (Dkt. No. 27), and Bausch & Lomb, Inc.'s ("B&L") (Dkt. No. 28) (collectively "Plaintiffs") motions for preliminary injunction. Plaintiffs'

consolidated motions ask this court to enjoin enforcement of recently enacted Utah Code Section 58-16a-905.1 ("section 905.1" or "the statute") pending final adjudication of its constitutionality. Plaintiffs assert that section 905.1 is an unconstitutional overreach of state legislative powers in that it impermissibly interferes with the nationwide contact lens market in violation of the Commerce Clause of the United States Constitution. Absent an injunction, section 905.1 is scheduled to take effect on May 12, 2015.

The court heard argument on the Plaintiffs' preliminary injunction motions on May 5, 2015. At the hearing, Plaintiff Alcon was represented by David R. Marriott, Jared Jenson, Amy Sorenson and Amber Mettler. Plaintiff JJVC was represented by Jonathan F. Cohn, Kwaku Akowuah and Tim Conde. Plaintiff B&L was represented by Clifford M. Sloan and Erik Christiansen. Defendant Sean D. Reyes, in his official capacity as Attorney General of Utah ("Utah"), was represented by Parker Douglas. Intervenor 1-800 CONTACTS, Inc. ("1-800") was represented by Paul G. Cassell, Brent Hatch, Garth Vincent and Greg Sergi. Intervenor Costco Wholesale Corporation ("Costco") was represented by Shylah R. Alfonso and Mark Bettilyon.

At the conclusion of the hearing the court took the matter under advisement. Since then, the court has further considered the law and facts relating to the motions and the arguments presented by counsel. Now, being fully advised, the court issues the following Memorandum Decision and Order.

## BACKGROUND

The contact lens industry in the United States is roughly a $4 billion dollar-per-year industry. (Alcon Mem. in Supp. at 5.) It is controlled by four primary contact lens

manufacturers – Alcon, JJVC, B&L, and CooperVision, Inc. (collectively the "Manufacturers") – who maintain an almost 100% market share of the industry. (Costco Opp'n at viii.) None of the four manufacturers are located in Utah.

The contact lens industry has two features that make it particularly susceptible to anticompetitive conduct. First, contact lenses may be sold only pursuant to a valid prescription from an eye care professional ("ECP"), and each prescription from the ECP is brand and model specific. Except in limited circumstances, neither the consumer nor a contact lens retailer has the power to substitute an alternative or cheaper option to the prescribed brand, such as a generic equivalent. Second, "[u]nlike medical doctors who are prohibited from selling the drugs they prescribe, [ECPs] . . . are able to fill the contact lens prescriptions they write." (1-800 Opp'n at 2-3.) In other words, an ECP is both a contact lens prescriber and a contact lens retailer. H.R. Rep. No. 108-318, at 5 (Fairness to Contact Lens Consumers Act) (Oct. 15, 2003). "In almost no other medical context does the prescriber of a medical device have the power to control both the brand the patient must use and also sell the particular medical device in the same breath." (Costco Opp'n at ix.)

Once prescribed, however, contact lenses may be purchased from either the prescribing ECP or from eye care retailers (e.g., LensCrafters), mass merchandise retailers (e.g., Costco, Wal-Mart), internet retailers (e.g., 1-800 Contacts), pharmacies, or any other person who sells the prescribed lenses.[1] However, because non-ECP retailers are unable to compete with ECPs by providing a different brand of contact lens than prescribed (such as a generic equivalent), the

---

[1] Under Federal law, the ECP is required to give the patient her prescription so the patient can purchase the contact lenses from the retailer of her choice based on price and convenience, among other factors. 15 U.S.C. § 7601(a); 16 C.F.R. § 315.3.

non-ECP retailer's only means of competing with an ECP retailer is to offer lower prices on the same brands and types of lenses.

Non-ECP retailers, such as Intervenors 1-800 and Costco, assert that because ECPs are the only contact lens retailers that are dual-positioned to both prescribe and sell contact lenses to consumers, ECPs can "leverage their control over prescriptions and brand selection to also control and monopolize contact lens sales." (Costco Opp'n at x.) The non-ECP retailers further assert that because of this control over the market, contact lens manufacturers have a strong interest in "incentivizing ECPs to prescribe their brands by assisting in various methods of shielding ECPs from retail competition by discounters." (1-800 Opp'n at 3.)

Conversely, the Manufacturers claim that they, alone, are burdened with the task of educating ECPs about innovative products and developments in the industry so that the ECPs can pass that information along to their patients. Accordingly, to foster good relationships with the ECPs, the Manufacturers have invested in programs that are extended only to ECPs and retailers associated with ECPs. These programs include but are not limited to manufacturer rebates, free trial lenses for ECPs, and launching new products exclusively with ECPs. (See Alcon Mem. in Supp. at 7.) According to the Manufacturers, these programs "improve patient access to better information and new technologies, and enhance access to better eye care." (Id.)

Prior Legislation and Litigation

Given the unique features of the contact lens business, the industry has a significant history of litigation and legislation. For example, in the 1990s, attorneys general from 32 states (including Utah) and a national class of consumers brought actions against the American Optometric Association and the contact lens manufacturers for conspiring with ECPs and others

4

to restrain competition with "alternative retailers" such as online companies, pharmacies and big box retailers.  See In re Disposable Contact Lens Antitrust Litig., MDL No. 1030, 2001 WL 493244 (M.D. Fla Feb. 1, 2001).  In 2001 – after nearly seven years of litigation – MDL 1030 culminated in a settlement, with the contact lens manufacturers paying a substantial cash settlement to consumers and agreeing to broad injunctive relief requiring the Manufacturers to sell contact lenses to non-ECP retailers in a "commercially reasonable" and "non-discriminatory" manner for at least five years.  (See 1-800 Opp'n at 4.)  After the injunctive provisions of the consent decree expired, the Utah Legislature, in 2006, essentially codified the "anti-discrimination" provisions of the MDL through the enactment of Utah Code Section 58-16a-904.  See Utah Code Ann. § 58-16a-904 (providing "a manufacturer of contact lenses doing business in the state" shall certify contact lenses to be "made available in a commercially reasonable and nondiscriminatory manner").

      The business practices of the contact lens industry have also yielded federal legislation.  In 2003, in response to allegations that the Manufacturers and ECPs were impeding consumers' ability to purchase contact lenses from discounters by (1) preventing consumers from obtaining copies of their prescriptions to purchase lenses elsewhere, and (2) erecting obstacles to non-ECP retailers' attempts to verify prescriptions, Congress enacted the Fairness to Contact Lens Consumers Act ("FCLCA").[2]  The FCLCA requires that a contact lens prescriber, "whether or not requested by the patient, shall provide to the patient a copy of the contact lens prescription," and establishes a prescription verification process allowing retailers to sell lenses if the ECP does not respond to a verification request within a certain time period.  15 U.S.C. §§ 7601 & 7603.

---

[2] See H.R. Rep. No. 108-318, at 4; Pub. L. 108-164, Fairness to Contact Lens Consumer Act (2003), codified at 15 U.S.C. § 7601 et seq.

Manufacturer Uniform Pricing Policies ("UPPs")

Approximately two years ago, the Manufacturers began implementing unilateral resale pricing policies ("UPPs").[3] These UPPs set a minimum retail price below which retailers may not sell certain contact lenses to consumers. If a retailer thereafter sells or prices that particular contact lens below the manufacturer's UPP, the manufacturer punishes the retailer by terminating supply of contact lenses for one year.

The Manufacturers claim that the UPPs benefit everyone by "allow[ing] [ECPs] to refocus the critical doctor/patient conversation on eye health and product performance, rather than cost." (Angelini Letter). According to Alcon, the Manufacturers face the challenge of "educating ECPs, who alone are authorized to write prescriptions, about the attributes of the products, and of encouraging them, in turn, to inform patients of their potential benefits." (Alcon Mem. in Supp. at 7.) Alcon suggests that "ECPs may be reluctant to undertake these efforts if, once the patient receives a prescription, it may be filled by a low-cost contact lens reseller whose business model does not include those investments and who 'free rides' on the professional services the ECPs provide." (Id.) Additionally, the Manufacturers claim the UPPs are beneficial because they "eliminate[] the need for discussions with eye doctors about other retailers' prices. Consumers are assured that if their [ECP] or any other retailer is charging the minimum price, there is no need to shop around for a better bargain." (JJVC Mem. in Supp. at 4.)

Non-ECP retailers, such as Intervenors Costco and 1-800, contend that the practical and intended effect of the UPPs is to divert sales from more efficient, lower-cost retailers. (Costco Opp'n at xiv.) They claim that by restricting retail price competition, consumers now have fewer

---

[3] The State of Utah and the Intervenors refer to the Plaintiffs' UPPs as minimum resale price maintenance ("RPM") policies.

6

product choices and must pay higher prices, resulting in less competition and higher margins for ECPs.  (Costco Opp'n at xv.)  They claim that the Manufacturers' justifications for implementing the UPPs are pretextual given that the UPPs do not require or even encourage ECPs to invest in tangible or intangible services or promotional efforts that might improve patient care.  (Costco Opp'n at xvi.)

Since implementation, the Manufacturers' UPPs have generated scrutiny.  On July 30, 2014, the U.S. Senate Committee on the Judiciary, Subcommittee for Antitrust, Competition Policy and Consumer Rights held a hearing to examine the use of resale price maintenance programs (or UPPs) in the contact lens industry.  The Committee noted their intent to revisit the issue once further evidence develops showing the impact of such policies on competition and consumer pricing.  (1-800's Opp'n at 8 (providing citation to Senate's website for video recording of Senate hearing).)  Additionally, in recent months roughly 40 consumer class action complaints have been filed, across the United States, against the Manufacturers, alleging violations of federal and/or state antitrust laws by engaging in an unlawful conspiracy to fix contact lens prices.[4]

Section 905.1

On March 10, 2015, the Utah Legislature amended the Contact Lens Consumer Protection Act through the addition of section 58-16a-905.1.  In doing so, Utah became the first state to enact legislation attempting to restrict UPPs for contact lenses.  Similar legislation has been proposed in Mississippi, Washington, Arizona, Florida, New York, Idaho, Oregon, Illinois and California.  (Costco Opp'n at xviii.)

---

[4] There are motions pending to coordinate or consolidate the actions into a multidistrict litigation forum.  In re Disposable Contact Lens Antitrust Litigation, MDL No. 2626 (2015).

Section 905.1 of the Contact Lens Consumer Protection Act provides as follows:

A contact lens manufacturer or a contact lens distributor may not:
(1) take any action, by agreement, unilaterally, or otherwise, that has the effect of fixing or otherwise controlling the price that a contact lens retailer charges or advertises for contact lenses; or
(2) discriminate against a contact lens retailer based on whether the contact lens retailer:
    (a) sells or advertises contact lenses for a particular price;
    (b) operates in a particular channel of trade;
    (c) is a person authorized by law to prescribe contact lenses; or
    (d) is associated with a person authorized by law to prescribe contact lenses.

Utah Code Ann. Section 58-16a-905.1.

The Utah Legislature also amended section 58-16a-906, to provide that "the attorney general may bring a civil action or seek an injunction and a civil penalty" against any person "who violates section 58-16a-905.1." Id. Before approving section 905.1, the Utah Legislature held hearings with views presented from the various conflicting interests, including Alcon and JJVC, various Utah retailers, the Utah Real Merchants Association, the Utah Manufacturers Association, and the Utah Optometric Association.

<u>The Present Lawsuit</u>

On April 13, 2015, Alcon initiated a declaratory judgment action seeking to have section 905.1 declared unconstitutional. Alcon accompanied the filing of its declaratory judgment action with the instant motion for preliminary injunctive relief. (Dkt. Nos. 2 & 5, respectively.) The next day, JJVC and B&L filed similar lawsuits and requests for injunctive relief. On April 21, 2015, the three separate actions were consolidated. (Dkt. No. 26.)

The State of Utah and Intervenors 1-800 and Costco assert that section 905.1 – which they perceive as simply prohibiting Plaintiffs from fixing the retail price of contact lenses in Utah – merely restores fair competition and will result in lower contact lens prices for

consumers. They claim section 905.1 is akin to countless state statutes "enacted pursuant to the traditional powers in the area of antitrust and unfair competition to regulate conduct that directly affects in-state consumers and business." (1-800 Opp'n at 2.)

The Manufacturers assert that section 905.1 violates the Commerce Clause of the United States Constitution because it impermissibly interferes with commercial conduct outside of Utah, discriminates against interstate commerce, and imposes an excessive burden on interstate commerce. (Alcon's Mem. in Supp. at 13-20.) They claim section 905.1 will have the effect of removing Utah-based retailers, and only Utah-based retailers, from the scope of national policies like the UPP, allowing in-state retailers to sell at lower prices than out-of-state retailers who try to serve Utah customers. (See Alcon's Mem. in Supp. at 3.) The Manufacturers assert that section 905.1 is unconstitutional and the injuries they will suffer when section 905.1 goes into effect will be irreparable. Accordingly, the Manufacturers assert they are entitled to a preliminary injunction, to have effect only for so long as is necessary for this court to issue a final judgment.

## DISCUSSION

"[A] preliminary injunction is an extraordinary remedy; it is the exception rather than the rule." General Motors Corp. v. Urban Gorilla, LLC, 500 F.3d 1222, 1226 (10th Cir. 2007) (internal quotation marks omitted). The movant must show: "(1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) [that] the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) [that] the injunction, if issued, will not adversely affect the public interest." Id. "The party seeking the preliminary injunction must show that the . . . factors weigh heavily and

9

compellingly in its favor" and "[t]he right to relief in a preliminary injunction must be clear and unequivocal." VR Acquisitions LLC v. Wasatch County, 2015 WL 417895, at *7 (D. Utah Jan. 30, 2015) (internal quotation marks omitted). In the context of a request for a preliminary injunction against enforcement of a state law, enacted in the public interest, these already-demanding standards are applied rigorously. See Heideman v. South Salt Lake City, 348 F.3d 1182, 1189 (10th Cir. 2003).

**1. Likelihood of Success on the Merits**

Plaintiffs have failed to convince the court that they are likely to succeed on the merits of this case. Plaintiffs argue that section 905.1 clearly violates the Commerce Clause, which grants Congress the exclusive power to regulate interstate commerce. (Alcon Reply at 6.) Specifically, Plaintiffs assert that the statute has impermissible extraterritorial effects, impermissibly discriminates against out-of-state economic interests, and imposes excessive burdens on interstate commerce. (Id.)

Extraterritorial Effects

The court is not persuaded that Plaintiffs are likely to succeed in demonstrating that section 905.1 has impermissible extraterritorial effects. The United States Supreme Court summarized what constitutes impermissible extraterritorial effects in Healy v. Beer Inst., 491 U.S. 324, 336 (1989): "[T]he 'Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State.'" Id. (quoting Edgar v. MITE Corp., 457 U.S. 624, 642-43 (1982)).

Any assertion that section 905.1 would impose such effects is circumvented by the Utah Supreme Court's recent explanation that, "[u]nder a deeply rooted and longstanding canon of

construction, statutes are presumed not to have extraterritorial effect. This presumption is a gapfiller, operating under a 'clear statement' rule. It provides that unless a statute gives a 'clear indication of an extraterritorial application, it has none.'" Nevares v. M.L.S., 345 P.3d 719, 727 (Utah 2015) (quoting Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247, 262-65 (2010)) (internal citation omitted). The court sees no clear indication of an extraterritorial application in the statute at issue here and, thus, no such application can be assumed at this point in the case.

Discrimination

Similarly, the court is not persuaded that Plaintiffs are likely to succeed in demonstrating that section 905.1 inappropriately discriminates against out-of-state economic interests. The United States Supreme Court has stated that state laws are discriminatory and "violate the Commerce Clause if they mandate 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" Granholm v. Heald, 544 U.S. 460, 472 (2005) (quoting Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore., 511 U.S. 93, 99 (1994); see also New Energy Co. of Indiana v. Limbach, 486 U.S. 269, 273 (1988) ("This 'negative' aspect of the Commerce Clause prohibits economic protectionism – that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.") However, "[n]ot every benefit or burden will suffice – only one that 'alters the competitive balance between in-state and out-of-state firms.'" Kleinsmith v. Shurtleff, 571 F.3d 1033, 1041 (10th Cir. 2009).

Plaintiffs concede that "read literally, [section 905.1] applies to manufacturers and distributors both within and outside Utah . . . ." (Alcon Mem. in Supp. at 19.) See Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris, 729 F.3d 937, 948 (9th Cir. 2013), cert.

11

denied, 135 S. Ct. 398 (2014) ("A statute that 'treats all private companies exactly the same' does not discriminate against interstate commerce. . . . This is so even when only out-of-state businesses are burdened because there are no comparable in-state businesses.") (citing United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., 550 U.S. 330, 342 (2007); Exxon Corp. v. Gov. of Maryland, 437 U.S. 117, 119, 125)).  Plaintiffs argue instead that the statute is discriminatory because it "protects 'a [Utah] contact lens retailer,' but not a non-Utah contact lens retailer, from manufacturer pricing policies . . . [and] entitles 'a [Utah] contact lens retailer,' but not a non-Utah contact lens retailer, to manufacturer programs that are designed for some kinds of retailers and not others." (Alcon Reply at 10.)

However, the record before the court supports Defendants' claim that "the fact that retail sales outside of Utah could be higher because of the [UPPs] is entirely the result of Plaintiffs' pricing policies—not any action taken by Utah." (Costco Opp'n at 14.)  Indeed, the purported burden that out-of-state retailers face as a result of the statute is simply that they may continue to be subject to UPPs and other policies implemented by contact lens manufacturers, whereas in-state retailers will not.  Section 905.1 in no way requires or anticipates that out-of-state retailers will continue to be subject to UPPs.  Instead, the statute merely protects Utah retailers and consumers from activity that the State of Utah believes violates principles of fair competition.

Antitrust law "is an area traditionally regulated by the States." California v. ARC America Corp., 490 U.S. 93, 101 (1989).  "Congress intended the federal antitrust laws to supplement, not displace, state antitrust remedies." Id. at 102.  As such, federal antitrust law sets a floor below which states cannot go, but states are free to legislate and regulate certain transactions more aggressively.  See, e.g., Exxon Corp. v. Gov. of Maryland, 437 U.S. 117, 129-

32 (1978). The statute at issue here is nothing more than a state antitrust statute, tailored to a specific industry, which the state has the power to enact. Id. at 133-34.

In Exxon, the Maryland legislature—in response to evidence that oil producers and refiners were favoring company-operated gasoline stations during the 1973 petroleum shortage—enacted a statute prohibiting petroleum producers and refiners from operating retail service stations within the State of Maryland and requiring that all temporary price reductions be extended uniformly to all service stations supplied within the state. Id. at 117. The plaintiffs in Exxon argued, similarly to Plaintiffs in the present case, that the Maryland statute discriminated against interstate commerce, unduly burdened interstate commerce, and imposed "controls on a commercial activity of such an essentially interstate character that it [was] not amenable to state regulation." Id. at 125. The United States Supreme Court rejected all three arguments, holding that the statute did not violate the Commerce Clause. Id. at 125-29. The Court noted that the Commerce Clause does not "protec[t] the particular structure or methods of operation in a retail market" nor does it invalidate a duly enacted state statute simply because the statute "causes some business to shift from one interstate supplier to another." Id. at 127. As in Exxon, the statute at issue here attempts to remedy a significant market issue—retail price fixing by contact lens manufacturers.

Based on the record before the court, section 905.1 appears to be no more restrictive than the statute upheld in Exxon. In Exxon, the statute required producers to provide uniform discounts to all service stations. Here, the statute merely requires that manufacturers refrain from mandating price fixing within the state of Utah and from discriminating against Utah retailers for reasons related to price fixing. This Utah statute, like the statute in Exxon, appears

13

to be an appropriately tailored antitrust statute within the legislative authority of the state. See ARC America Corp., 490 U.S. at 101-02; see also Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979, 993-94 (9th Cir. 2000) (holding that "California may apply its antitrust and unfair competition statutes consistent with the Commerce Clause" to a price fixing scheme in Wisconsin that affected prices in California).

Plaintiffs argue that the legislation at issue here is unique because "unlike traditional state antitrust, consumer protection, and public safety laws, . . . [the statute] forces out-of-state manufacturers and distributors who want to withdraw from commerce with a state resident…to continue engaging in interstate commerce with them." (Alcon Reply at 7.)  Plaintiffs assert that Section 2 of the statute, which prohibits "discrimination" against retailers, essentially "instructs the Attorney General to penalize a manufacturer for deciding not to ship contact lenses to Utah . . . ." (Id.)  At this early stage of the proceedings, a pre-enforcement request for preliminary injunction, Plaintiffs' constitutional concerns are premature and speculative.

First, a Utah statute that has been in effect since 2006 already expressly penalizes contact lens manufacturers that fail to make contact lenses available to retailers in a nondiscriminatory and commercially reasonable manner.  Utah Code Ann. § 58-16a-904.  Plaintiffs have presumably complied with this statute since 2006, and nothing in the record before this court indicates that the statute has been enforced in a way that impermissibly compels or effects interstate commerce.

Second, because section 905.1 has not yet taken effect, the Utah Attorney General's Office has not had the opportunity to offer its interpretation of the statute in connection with an actual enforcement action.  At oral argument, the Attorney General's representative expressed

some uncertainty as to how and to what extent the law will be enforced. At this early stage, the court presumes the Utah Attorney General will enforce the statute in a manner that does not violate the Commerce Clause. See, e.g., Nevares v. M.L.S., 345 P.3d 719, 727 (Utah 2015) (providing that duly enacted state statutes are presumed to be constitutional). At this stage, the court does not find that Plaintiffs have established that this statute is significantly different from other state antitrust statutes that have been upheld.

### Burden on Interstate Commerce

The court is also unpersuaded that Plaintiffs are likely to succeed in demonstrating that the burden imposed on interstate commerce by the statute is clearly excessive in relation to the putative local benefits. Even if a state statute does not improperly discriminate or have impermissible extraterritorial effects, it will violate the Commerce Clause if it imposes a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits." Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970). This inquiry requires the court to consider "(1) the nature of the putative local benefits advanced by the Ordinance; (2) the burden the Ordinance imposes on interstate commerce; (3) whether the burden is "clearly excessive in relation to" the local benefits; and (4) whether the local interests can be promoted as well with a lesser impact on interstate commerce." Blue Circle Cement, Inc. v. Bd. of Cnty Comm'rs, 27 F.3d 1499, 1512 (10th Cir. 1994).

The putative local benefit is that section 905.1 "would return intrabrand competition to the Utah contact lens marketplace, allowing Utah contact lens retailers to provide lower prices to Utah consumers." (Costco Opp'n at 13.) As discussed above, this is exactly the type of benefit states are permitted to advance through state antitrust laws.

The purported burden on interstate commerce is that out-of-state manufacturers would have to "participate in interstate commerce, under circumstances which they otherwise would choose not to . . ." and that retailers in Utah, but not retailers in the other 49 States, would be exempt from certain manufacturer policies. (Alcon Reply at 13-14.) This purported burden appears to be no greater than the burden imposed by any other state antitrust law. Indeed, as with apparent competitive advantages that may be gained by in-state businesses through other state antitrust laws, any competitive advantages obtained by Utah contact lens retailers through this statute will be negated if other states enact similar antitrust laws of their own. As noted above, such legislation is presently under consideration in at least 9 states. Consequently, Plaintiffs are not likely to demonstrate that the burden on interstate commerce imposed by the statute is "clearly excessive in relation to" the local benefits.

**2. Irreparable Harm if the Injunction is Denied**

Similarly, Plaintiffs have failed to convince the court that they will suffer irreparable harm if the injunction is denied. Establishing irreparable harm is not an "easy burden to fulfill." Greater Yellowstone Coalition v. Flowers, 321 F.3d 1250, 1258 (10th Cir. 2003). "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." Heideman v. South Salt Lake City, 348 F.3d 1182, 1189 (10th Cir. 2003).

Plaintiffs claim they will suffer two primary forms of irreparable harm absent an injunction—constitutional injury and economic injury. (Alcon Mem. in Supp. at 22.) Plaintiffs' claimed constitutional injury is the "[d]eprivation of the rights guaranteed under the Commerce Clause[.]" Am. Civil Liberties Union v. Johnson, 194 F.3d 1149, 1163 (10th Cir. 1999). As discussed in detail above, these constitutional injuries are speculative at this stage and, as such,

16

Plaintiffs have failed to establish injuries that are certain, actual and imminent, as required for a preliminary injunction.  See Heideman, 348 F.3d at 1189 ("[T]he party seeking injunctive relief must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.").

Plaintiffs' claimed economic injuries include "financial loss that cannot be recovered because of the state's sovereign immunity from suits for damages" and the possibility that the Plaintiffs' inability to enforce UPPs will "suppress [Plaintiffs'] incentives and ability to invest in research and development."  (Alcon Mem. in Supp. at 23.)  These injuries, like Plaintiffs' claimed constitutional injuries, rely on Plaintiffs' speculation, both as to the monetary amounts of such injuries, and how section 905.1 will be enforced.  Such hypothetical injuries are insufficient to constitute irreparable harm.  See Goldammer v. Fay, 326 F.2d 268, 270 (10th Cir. 1964) ("Injunction is a drastic remedy to be exercised with caution, and should be granted only is cases where the necessity therefore is clearly established."); Voile Mfg. Corp. v. Dandurand, 551 F. Supp. 2d 1301, 1307 (D. Utah 2008) (holding that a "probable loss in market share" was not the type of damage that amounts to irreparable harm).  Accordingly, the court concludes that Plaintiffs have failed to meet their burden of establishing irreparable harm.

### 3.   The Balance of Hardships & Public Interest

Finally, the balance of hardships and public interest factors also weigh against granting a preliminary injunction in this case.  Utah's ability "to enact and enforce measures it deems to be in the public interest is [] an equity to be considered in the balance of hardships."  Heideman, 348 F.3d at 1191.  Entering an injunction in this case would prevent enforcement of a law that the Utah Legislature determined was necessary to protect consumers and promote free

competition in the retail market for contact lenses.  Indeed, according to Costco, the UPPs have forced Costco "to raise contact lens prices by as much as 35%, while undermining Costco Wholesale's business model, reducing product choice, foreclosing retail competition, and damaging its goodwill."  (Costco Opp'n at 16.)  In contrast, as the court has previously explained, any alleged harm to Plaintiffs is speculative.

Similarly, although Plaintiffs appeal to the public interest of upholding the Constitution as a basis for granting the preliminary injunction, as explained by the court more fully above, Plaintiffs have failed to persuade the court that they are likely to succeed on their claim that section 905.1 is, in fact, unconstitutional.

Section 905.1 was enacted by the elected representatives of the people of Utah after a determination that it was in their best interest.  See Utah Gospel Mission v. Salt Lake City Corp., 316 F. Supp. 2d 1201, 1223 (D. Utah 2004), aff'd, 425 F.3d 1249 (10th Cir. 2005) (denying motion for preliminary injunction and finding public interest would be impaired because it would "undermine the public process by nullifying the decision . . . [by] elected officials.  The [democratic] process . . . was extensive, time consuming, very public and often wrenching and divisive.  A compromise was reached through democratic means, and it would not be in the public interest to set this process aside.").  After extensive public hearings and legislative debates, wherein Plaintiffs were provided a fair opportunity to present their positions, the people of Utah chose to enact section 905.1 to eliminate price fixing in favor of free competition.

For these reasons, Plaintiffs have failed to satisfy the court that enjoining section 905.1 would be in the best interests of the public.

## **CONCLUSION**

Based on the foregoing, Plaintiffs' consolidated motions for preliminary injunction are DENIED. Plaintiffs have failed to satisfy the court that they have met the requirements for a preliminary injunction. Specifically and significantly, the court is not persuaded at this stage in the litigation that the Plaintiffs are likely to succeed on the merits.

Dated this 11th day of May, 2015.

_____
Dee V. Benson
United States District Court Judge